IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00476-MEH

GILBERT W. LOPEZ,

      Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

     Plaintiff, Gilbert W. Lopez, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **AFFIRMS** the Commissioner's final order.

## I. STATEMENT OF THE CASE

     Plaintiff seeks judicial review of the Commissioner's decision denying his applications for DIB and SSI benefits filed on January 27, 2009. [Administrative Record ("AR") 211-217] After

the applications were initially denied on April 28, 2009 [AR 121-126], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for December 3, 2010 [AR 137-141]; Plaintiff and a vocational expert gave testimony at the hearing.  [AR 40-92]  The ALJ issued a written ruling on January 18, 2011, in which the ALJ denied Plaintiff's application stating he was not disabled since December 11, 2008, because the Plaintiff did not have a severe impairment equaling those listed in the applicable federal regulations (Step 3); he had the residual functional capacity ("RFC") to perform work with some limitation on exertional levels and some limitation on non-exertional levels (Step 4); and considering Plaintiff's age, education, work experience and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff can perform (Step 5).  [AR 95-116]

On April 17, 2012, the SSA Appeals Council granted Plaintiff's request for review of the decision and remanded the case to the ALJ to provide a more detailed assessment of the limitations in the RFC in specific work-related terms. [AR 118-119] Accordingly, the ALJ held a subsequent hearing on October 3, 2012 at which Plaintiff, a vocational expert, and two medical experts testified. [AR 62-92].  The ALJ issued another written ruling on October 25, 2012 in which he essentially affirmed the previous decision upon additional expert testimony. [AR 14-32]  The SSA Appeals Council subsequently denied Plaintiff's second administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-4]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II. BACKGROUND

Plaintiff was born on October 17, 1969; he was 39 years old when he filed his applications for disability and supplemental security income benefits on January 27, 2009.  [AR 258]  Plaintiff claims his disability began on December 11, 2008, and he was not disabled prior to the age of 22. [*Id.*]  For the present applications, Plaintiff reported that he was limited in his ability to work by neck, back, and knee problems; depression; and migraines.  [AR 263]  Plaintiff claims that his last day of work was December 8, 2008 because he "ha[d] to have surgery on [his] knee" [*id.*]; however, he testified later that he separated from his last job due to lack of work [AR 43].  Plaintiff reported that he "can't stand up more than 8 hours. My back and neck start hurting. I can't lift anything over 50 pounds. Jobs that are stressful, I get depressed." [AR 263]   Plaintiff states that he took Hydrocodone, Stodolac and Ibuprofin for his pain; Omeprazole for his acid reflux; Relpax for his migraines; and Zoloft for depression.  [AR 267]

Plaintiff's work history included "truck driver" from 1994-2005; "meat cutter" from Jul 2006 to Jan 2007; "cook" from Feb 2007 to Mar 2007; "case picker" from Mar 2007 to May 2007; and a "paint mixer" from Nov 2007 to Dec 2008.  [AR 270]  His earnings in 1994 through 2006 varied between $19,263.87 to $49,954.19, and in 2007 were $14,159.53, and in 2008 were $15,705.46. [AR 251-252]  There is no income listed for the years 2009-2012.  [*Id.*]

Plaintiff claims that he was seen at Pueblo Community Health Center ("PCHC") for treatment of his knee injury.  However, the first medical record regarding a knee injury is from Parkview Emergency Department on November 11, 2008, which indicates that Plaintiff arrived complaining of right knee and left foot pain. [AR 342-345] Plaintiff reported that he had knee pain

3

on and off for two weeks, was unsure of any specific injury, but stated that he injured it eight years previously. [AR 342] After examination, the physician applied a splint to immobilize the knee, suggested elevation and ice, and directed Plaintiff take Naproxen as needed for pain. [AR 344]

The records from PCHC indicate that Plaintiff was first seen there a month later on December 10, 2008 (the day before his alleged disability onset date) for "right knee pain for 1 week." [AR 323] Plaintiff reported that "he was at work lifting up a box and felt something in his knee give out." [*Id.*] The physician assistant ordered an MRI, prescribed Vicodin for the pain, and issued a written excuse from work for one week. [*Id.*] The MRI was performed on January 2, 2009 [AR 325] and Plaintiff returned to PCHC on January 22, 2009 for a follow-up appointment [AR 322]. However, the January 22 record indicates that Plaintiff complained primarily of stomach pain and incidentally reported he had already seen an orthopedic surgeon who recommended surgery, but he could not afford it, so was "hoping to get this set up through disability." [AR 322]

In fact, another record from Parkview Medical Center indicates that Plaintiff saw Charles Rowland, M.D. on December 22, 2008 for "evaluation of chronic right knee pain." [AR 365] Plaintiff reported that he suffered a "significant injury" nine years earlier when a 900-pound safe tilted over from a dolly and fell on top of his knee, and the most recent episode occurred on December 2 while lifting an object overhead and his knee hyperextended. [*Id.*] Dr. Rowland advised proceeding with an MRI and arranged to meet with Plaintiff after getting the results. [*Id.*] Plaintiff saw Dr. Rowland again on January 7, 2009 and learned that the MRI revealed "a full thickness cartilaginous defect involving the medial femoral condyle." [AR 418 ] Dr. Rowland advised and Plaintiff agreed to proceed with arthroscopic chondroplasty "to be done in the near future at

4

[Plaintiff's] convenience." [*Id.*]

Dr. Rowland performed the procedure pursuant to a diagnosis of "degenerative arthritis" on March 17, 2009. [AR 369]   The doctor noted finding no meniscal or anterior cruciate ligament (ACL) tears, and sent Plaintiff to the recovery room in good condition. [AR 369-370] On April 1, 2009, Plaintiff saw Dr. Rowland for a follow-up, reported continued soreness, and told the doctor that he was planning to obtain disability because he did not believe he could "trust his knee" to support him in a job driving a cement truck. [AR 416] The doctor notes that Plaintiff's wounds were well healed and suggested no additional treatment "at this time." [*Id.*]

Following the filing of his present application, Plaintiff was referred to Justin Olswanger, D.O. for a consultative physical examination on April 4, 2009.  [AR 374]  Plaintiff reported he "blew out his knee in December after injuring it at home. Got surgery, tore his meniscus. ... still has pain with certain movements. Never did physical therapy." [*Id.*] Dr. Olswanger examined Plaintiff's right knee and reviewed two x-rays which he determined to be "normal." [AR 378] The doctor also considered Plaintiff's complaints of neck and back pain; Plaintiff reported that, "a while back," he fell about 15 feet at work, landed on his back, and was paralyzed from the waist down for about 30 seconds. [AR 374] The x-rays from that time showed a "bulge" in his back and another in his neck at C6-C7, but he was afraid to do cortisone injections for the pain. [*Id.*] Upon examination, Dr. Olswanger noted some "tenderness to palpation on the paraspinal musculature of his cervical and mid-thoracic and lumbar spine," but noted that the x-ray of the lumbosacral spine was normal. [AR 378-379] Dr. Olswanger concluded that Plaintiff could sit, stand and walk about four hours in an 8-hour workday, could lift and carry ten pounds frequently and occasionally, and should be limited

in "anything involving range of motion of [the] spine"; the doctor imposed no other functional limitations. [AR 379]

On April 28, 2009, the SSA sent to Plaintiff Notices of Disapproved Claims stating "[w]e have determined that your condition is not expected to remain severe enough for 12 months in a row to keep you from working." [AR 121, 124] The notices informed Plaintiff that, if he disagreed with the decision, he had a right to request a hearing within 60 days after receiving the notice. [ AR 122, 125] Thus, on May 12, 2009, Plaintiff completed an Appointment of Representative form with the DDS which identifies Michael Seckar as his attorney [AR 128], and a Request for Hearing by Administrative Law Judge form, which was received by the SSA on May 19, 2009 [AR 129].

On May 26, 2009, the Office of Disability Adjudication and Review (ODAR) sent Mr. Seckar a letter confirming receipt of the request for hearing, informing Plaintiff of hearing procedures and explaining that a Notice of Hearing will be sent at least 20 days before the hearing notifying him of the time and place. [AR 130-131]

Meanwhile, Plaintiff sought treatment between approximately February and April 2009 for abdominal problems, but he has not put those in issue in the case, so the Court will not consider them. On June 16, 2009, Plaintiff visited the Pueblo Community Health Center ("PCHC") complaining that he was "suicidal" and "contemplating hanging himself," and also had concerns about two moles on his back [AR 484], which he later had removed on July 7, 2009 [AR 483]. For the mental issues, Plaintiff was referred to Tom Clemens, LCSW, who spent an hour assessing Plaintiff's mental health. [AR 502-505] Plaintiff reported that he lived with his "significant other" and her children, and was having difficulty with financial obligations including child support for

6

children from a previous marriage whom he had not seen since 2005. [*Id.*] Plaintiff asserted that he had attempted numerous times in the past to kill himself, mostly by hanging and, in 2007, with a gun; however, Mr. Clemens noted it was "odd" that Plaintiff had never had any inpatient treatment. [AR 504] Mr. Clemens diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features; personality disorder, nos ("not otherwise specified") with antisocial traits and borderline personality traits; and a GAF score of 50.[1] [AR 504-505]

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and

A week later, on June 24, 2009, Plaintiff presented to the Parkview Emergency Department seeking further help for depression and suicidal thoughts. [AR 423-432] Plaintiff reported concerns of chronic unemployment and being pressured into paying child support, and stated he had thoughts of hanging himself. [AR 428] He was admitted for three days' observation and treatment, and was discharged home with diagnoses of anxiety disorder and depression, both not otherwise specified, and a GAF score of 60.  [AR 420-422]

Plaintiff returned to Mr. Clemens on July 2, 2009 with information about the hospital stay and for a follow-up. [AR 526] Mr. Clemens changed his diagnosis to mood disorder, nos and personality disorder, nos, with antisocial traits. [*Id.*] Plaintiff agreed to attend therapy twice a month with Mr. Clemens. [*Id.*] That same day, Plaintiff also saw Eileen Spanger, Psych NP, for a psychiatric assessment; she performed a "mental status exam" and determined Plaintiff was, among other things, mildly depressed, actively cooperative and had an appropriate affect, had an average intellect, fair insight and his judgment was intact. [AR 533] Ms. Spanger diagnosed Plaintiff with depression, nos and stated "r/o [rule out] malingering." [AR 535]

---

is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

According to the records, Plaintiff saw Mr. Clemens once a month from August to December 2009; during these sessions, Plaintiff primarily reported "feeling better" as his medications were adjusted. [AR 520-525] Mr. Clemens noted in December that he discussed "termination" with Plaintiff and that Plaintiff wished to continue therapy with another clinician. [AR 520]

Meanwhile, Plaintiff met with David Krause, M.D. on August 25, 2009 complaining of neck and back pain. [AR 482] After examination, Dr. Krause noted "full range of motion," negative tests, and normal grip strength, but Plaintiff reported pain on palpation in some areas. [*Id.*] The doctor ordered another MRI of Plaintiff's neck and an x-ray of Plaintiff's back. [*Id.*] Plaintiff returned to see Dr. Krause on October 16, 2009; the doctor noted the x-rays and MRI revealed "some mild degenerative arthritis but no bulging disks [sic] or neuroforaminal impingement." [AR 481] The doctor determined that no anesthetic injection was indicated, but advised continuing with pain medication and muscle relaxants, and to return as needed. [*Id.*] Plaintiff did return months later on February 8, 2010 for a "follow-up"; Dr. Krause repeated that the MRI was "basically normal" and the x-ray showed mild arthritis. [AR 480] Plaintiff reported that his knee pain was worse and he would "like to get a 2nd opinion"; thus, the doctor noted they would "try to get him in to see another orthopedic surgeon." [*Id.*]

Dr. Krause also completed what appears to be a physical functional assessment on the same day. [AR 456-458] The doctor diagnosed Plaintiff with "degenerative arthritis lower back" and assessed limitations for lifting and carrying to 20 pounds; sitting for four out of eight hours; standing for two out of eight hours; stooping, squatting, crawling and kneeling should be done rarely; reaching, handling and fingering could be done occasionally; and the doctor stated that these

9

limitations had been at such levels for one year. [*Id.*]

A record dated February 11, 2010 reveals Plaintiff's first meeting with his "new" therapist, Elizabeth Richards, LCSW, for a therapy session. [AR 518-519] Ms. Richards noted Plaintiff's recall of abuse as a child by his stepfather and diagnosed Plaintiff with mood disorder, nos, with a rule out of bipolar disorder; posttraumatic stress disorder; and personality disorder, nos, with antisocial traits. [*Id.*]

Plaintiff saw Ms. Richards every two weeks through the end of March 2010; by that time, Ms. Richards omitted "bipolar disorder" from her diagnosis. [AR 512] Plaintiff met with Ms. Richards once in April, then on May 18, 2010, Mr. Richards reported that they "worked on some boundary issues in session related to client 'liking' therapist." [AR 507] Again, on June 11, 2010, Ms. Richards noted that Plaintiff was "having a lot of 'bad thoughts' about therapist" and they had to "work on some more boundary setting." [AR 500] Plaintiff next saw Ms. Richards two months later on August 12, 2010; Ms. Richards noted a rescheduling and cancellation. [AR 498] She also repeated what Plaintiff reported through the year - that Plaintiff "feels [the medications] are doing what they need to do" to help him. [*Id.*] Plaintiff saw Ms. Richards once in September 2010, then on October 12, 2010, Ms. Richards noted Plaintiff failed to show at his previous appointment, was ticketed for shoplifting, and had been off his medication due to lack of finances [AR 494].

Meanwhile, Plaintiff presented to Michael Daines, M.D. on March 26, 2010 for "knee arthritis" complaining that, since the surgery in March 2009, he had continued pain and "mechanical symptoms," and sought a "second opinion." [AR 489] Dr. Daines reviewed the notes and MRI from the previous surgery and determined to treat Plaintiff "conservatively," so injected lidocaine in the

10

knee; after ten minutes, the doctor examined Plaintiff again and found he had "almost-complete relief of symptoms and his range of motion was full." [*Id.*] Dr. Daines informed Plaintiff that a certain "microfracture procedure" could be helpful, but he was "not sure that is the best idea" and directed Plaintiff to return for an examination in six months. [AR 490]

On March 31, 2010, Plaintiff saw a new doctor for his neck and back pain, Scott Davidson, MD. [AR 478-479] Plaintiff reported that he fell at work in 2003 and suffered "some sort of spine fracture"; he had been on several medications which gave him no relief, but he found that his mother's Percocet relieved the pain; and he had a history of bipolar disorder. [*Id.*] Dr. Davidson ordered an MRI of Plaintiff's lumbar spine and prescribed Percocet for "severe pain." [*Id.*] Plaintiff returned to Dr. Davidson on April 28, 2010 complaining of pain, particularly in his knee, and stating that Dr. Daines had recommended knee replacement. [AR 477] The doctor noted that the MRI " did not show any significant spinal stenosis" and continued Plaintiff on his medication; the doctor also noted that Plaintiff's migraines were "still adequately relieved with abortive therapy." [*Id.*]

For his knee, Plaintiff returned to Dr. Daines two months later, on May 25, 2010, informing the doctor that he wished to proceed with the microfracture procedure. [AR 491] Dr. Daines noted that he reviewed "results" and "xrays ... which show no evidence of arthritis." [*Id.*] The doctor also noted his "concerns" that Plaintiff might not "get a really good result from this," so he determined to "go in and have a look" then "decide what we are going to do based on what we see." [AR 492]

A record from June 15, 2010 reflects Plaintiff's follow-up appointment with Dr. Daines post surgery. [AR 488] Dr. Daines notes that he found during surgery "a chondral defect with surprisingly good cartilage margins" and proceeded with the microfracture. [*Id.*] Plaintiff reported

no problems, no swelling and his pain was well-controlled. [*Id.*]

Plaintiff saw Dr. Davidson on July 2, 2010 "to have his AND papers completed." [AR 476] Plaintiff reported that he had knee surgery on June 3 and "he was told by the surgeon that this was just going to be a temporary fix and that at some point soon his is going to need to have a knee replacement." [*Id.*] Dr. Davidson noted that Plaintiff "is still unable to work due to his chronic knee pain and degeneration, his chronic low back pain as well as psychiatric issues." [*Id.*]

Plaintiff returned to Dr. Daines on July 20, 2010 for a follow-up appointment; Plaintiff reported that he complied with nonweightbearing instructions except when he "ran around for most of the day without using his crutches in a water fight." [AR 487] Plaintiff returned again on September 10, 2010 reporting that he had increased his walking to four miles every other day and "has been actually pretty happy with things overall." [AR 486] Dr. Daines instructed that Plaintiff return only as needed for treatment. [*Id.*]

Plaintiff saw Dr. Davidson again on August 13, 2010 for a follow-up appointment; he reported that he had started physical therapy, experienced some nausea with taking Percocet, and had occasional migraines "well relieved with Relpax." [AR 475] The physical therapy reports indicate that Plaintiff began therapy on August 4, 2010, then cancelled or failed to show for five out of the next eight sessions. [AR 554-566]

On October 18, 2010, the ODAR sent Plaintiff a Notice of Hearing informing the Plaintiff that the hearing would occur on December 3, 2010 in Pueblo, Colorado.  [AR 137-141]  The notice contained forms for the Plaintiff to complete, including an acknowledgment of receipt of the notice, recent medical treatment, medications and work history. [AR 142-158] Plaintiff signed an

acknowledgment of receipt of the notice on October 25, 2010. [AR 159]

On November 3, 2010, Ms. Richards completed a Residual Functional Capacity ("RFC") Evaluation (Mental) for the Plaintiff in which she noted that she had met with Plaintiff approximately twice per month since February 2010, stated her diagnoses of mood disorder, nos, post traumatic stress disorder, and personality disorder with antisocial traits, and assessed moderate to extreme limitations in Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation. [AR 536-538]

At Plaintiff's attorney's request, Plaintiff also presented to Jose Vega, Ph.D. on November 15, 2010 for a Mental RFC Evaluation. [AR 539-545] Plaintiff reported to Dr. Vega that he had been a truck driver for 17-18 years before he "blew out" his knee in 2008 and stopped working. [AR 539] He also reported that he was married 17 years, divorced in 2005, and "had not been involved with anyone since his divorce." [AR 540] Plaintiff told Dr. Vega that he was sexually molested by his stepfather from the age of 2 through 12 or 13 when "the truth came out"; however, he also told the doctor that his "natural parents divorced when [Plaintiff] was about 17 years of age." [*Id.*] Plaintiff reported problems with his neck, back and migraine headaches and rated his pain as a constant 8 on a scale of 0-10. [*Id.*] Nevertheless, Dr. Vega found that Plaintiff's "primary psychological issues of mood swings, anger and [past] suicide attempts would seem to be most pronounced, which would affect his ability to meet the demands of competitive employment." [AR 542] Dr. Vega diagnosed Plaintiff with mood disorder, nos, post traumatic stress disorder, chronic, and suspect personality disorder, nos, with borderline and antisocial traits, and assessed a GAF score of 45-50. [AR 543] He also assessed slight to moderate limitations in understanding and memory; slight to extreme

13

limitations in sustained concentration and persistence; moderate to extreme limitations in social interaction; and moderate to extreme limitations in adaptation. [AR 544-545]

The next record demonstrating a meeting with Ms. Richards is dated November 18, 2010, more than a month after the previous session. [AR 615-616] Plaintiff reported that, "after meeting with Dr. Vega, it is more confirmed in his mind that he has bipolar disorder." [AR 616] Ms. Richards agreed – "Looking back over about the last 6 to 8 months, he does pretty clearly have a cycle of depression as extreme anger and rage going into a hypomanic versus manic state" – and changed her diagnosis from mood disorder, nos to "bipolar 1 disorder, most recent episode depressed, moderate, with a rule out of severe." [AR 615]

On November 19, 2010, the ODAR sent to Plaintiff and his counsel an "Important Reminder" of the hearing scheduled for December 3, 2010.  [AR 160-161] The day of the hearing, Plaintiff and his counsel appeared and Douglas Pruding appeared as a vocational expert.  [AR 38] Plaintiff testified that he completed the ninth grade in school; he has a driver's license and drives his friend's car occasionally; he had not worked since December 2008 at which time he was a "paint maker";  left the paint maker job due to lack of work; he can stand and sit for 10-15 minutes at a time until his neck, back and knee start hurting; his back goes out if he lifts more than 10-15 pounds; he gets the "shakes" every once in awhile; it is difficult for him to stoop or squat to lift something because of his back and knee; he's been depressed since 2005, but it kept him from working starting in 2009; he was seeing a therapist 3-4 times per month; he got nervous and angry around other people, which caused he and his girlfriend to break up in April after three years; he becomes confused and cannot concentrate if he is in a room with people who are all talking; he spent "85%

of the day" or "eight hours" during daytime in bed; and once he gets up in the morning, he goes back to bed three or four times.  [AR 40-52]

After listing the skill and exertional levels for Plaintiff's past work, the vocational expert, Mr. Pruding, then testified that a hypothetical employee – same age and educational background as the Plaintiff; who is limited to a "light" exertion level; standing and walking would be for six out of an eight-hour day, but limited in the need to alternate from that posture to sitting as needed because of a right knee difficulty; posturally, there would be no climbing of ladders, ropes, and scaffolds; stairs and ramps would be occasional; no balancing; stooping, bending, and crouching would all be occasional; no kneeling nor crawling; overhead reaching bilaterally would be occasional; avoid concentrated exposure to extreme cold, vibration and hazards such as unprotected heights or unprotected running or operating manufacturing machinery; and work could be performed at the semi-skilled level; decreased interpersonal contact with the general public, co-workers, and supervisors; ability to maintain attention and concentration would be limited to a moderate level; ability to work in coordination or proximately to others and the ability to interact appropriately with the general public, supervisors, and co-workers would be limited to a moderate level; and the ability to respond appropriately to changes in the work setting would be limited to a moderate level – could not perform the Plaintiff's past relevant work. [AR 53-54] However, he could perform the following jobs in Colorado in a manner generally compatible with their descriptions in the DOT: order filler in a distribution warehouse, electronics tester, and small products assembler.  [AR 54]

When asked if the hypothetical employee had a "marked" limitation on the mental impairments listed, Mr. Pruding testified there are no jobs compatible with such limitation.  [AR 57]

He also testified that the order filler would sit, stand and walk an equal amount of time in an eight-hour day, and the electronics tester and small products assembler would be mostly sitting with some standing and walking. [AR 55-57] Finally, Mr. Pruding added another potential job of parking lot attendant as a "seated light" position, then testified that this job, too, would be eliminated if the mental limitations were changed to "marked." [AR 58-60]

Plaintiff next saw Ms. Richards for a therapy session on December 14, 2010, nearly a month after the previous session. [AR 613-614] He reported feeling more depressed, that he learned his girlfriend was cheating on him, and that he slept most of the day recently. [AR 614-615] Ms. Richards noted her recommendation to the psychiatrist that Plaintiff be prescribed a mood stabilizer and stated she would see Plaintiff in two weeks. [*Id.*] A month later, Plaintiff saw Ms. Richards on January 14, 2011 at which session he reported feeling better; he had started a new medication prescribed by the new psychiatrist, Dr. Sciamarella [AR 624-640], and felt better after the holidays. [AR 612-613]

On January 18, 2011, the ALJ issued an unfavorable decision finding the Plaintiff not disabled since December 2008 determining that Plaintiff had been engaged in no substantial gainful activity since the onset date; he suffered severe impairments of mild degenerative disc disease of the cervical and lumbar spine; a lumbar strain; status-post cartilage repair surgery for the right knee; depression, nos vs. mood disorder, nos; an anxiety disorder, nos; and post-traumatic stress disorder, none of which met or medically equaled the listed impairments in 20 C.F.R. Part 404, Appendix 1; and Plaintiff had a residual functional capacity that allowed him to perform jobs that exist in significant numbers in the national economy. [AR 100-112] Plaintiff requested review of the

decision by the Social Security Appeals Council on March 16, 2011; thirteen months later, the

Council issued a ruling on April 17, 2012 finding that the ALJ improperly used the term "moderate"

in describing mental impairment limitations in the RFC, vacating the ALJ's decision, and remanding

the case to the ALJ with the following instructions:

> •      The Administrative Law Judge should give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 96-8p).

> •   If necessary, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14).    The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.   The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

[AR 118-119]

Meanwhile, the Plaintiff presented to Parkview Medical Center on January 28, 2011

complaining of "left facial numbness, hands tingling, upper chest pressure and migraine." [AR 572]

However, all objective tests - including an EKG, MRI of cervical spine, MRI of the brain, CT scan

of the head, and portable chest x-ray - resulted in "normal" findings, except "a minimal disc bulge

without significant central canal stenosis or neuroforaminal narrowing" at the C6-C7 discs in

Plaintiff's neck. [AR 574-582]

Plaintiff did not see Ms. Richards again until March 4, 2011 at which session she noted

Plaintiff "no-showed" at the last two appointments set for February 21 and February 24; Plaintiff told Ms. Richards that he was hospitalized at that time for "facial numbness, tingling and weakness." [AR 609-610] Plaintiff also reported that he was "doing much better" and had learned he was "denied for disability." [*Id.*] A month later, on April 7, 2011, Plaintiff reported to Ms. Richards that he was "doing pretty good" and his "medications [were] working well." [AR 607-608] Ms. Richards noted Plaintiff "appears psychiatrically stable." [*Id.*] Two weeks later, however, Plaintiff reported to Ms. Richards that he was feeling badly and withdrawing from his friends and other people. [AR 605-06] The next record, dated June 10, 2011, indicates that Plaintiff "no-showed" for an appointment due to "being in the  emergency room," that he was "doing pretty well" and his "medications [were] working really well for him." [AR 603-604]  On July 12, 2011, Plaintiff reported that he had a new girlfriend, that he was "doing well" and his "mood has continued to remain stable."  [AR 601-602] On August 16, 2011, Plaintiff reported that he was "doing pretty good," "getting out a lot more," and "being more active," which improved his mood. [AR 599-600]

Nearly three months later, on November 1, 2011, Plaintiff reported to Ms. Richards that he had been "doing well" and moved in with his girlfriend. [AR 597-598] Ms. Richards noted that Plaintiff had not been cooperative in working on his history of sexual abuse and seemed "superficial" with her "over the past probably 6 months or so." [*Id.*] On November 28, 2011, Ms. Richards noted that Plaintiff "again missed an appointment with me 2 weeks ago." [AR 595-596] Mr. Richards determined that, to continue therapy, Plaintiff must sign a contract that he would miss no more appointments unless he was in the hospital; Plaintiff agreed. [*Id.*] On December 21, 2011, Plaintiff admitted to Ms. Richards that he had been off his mood stabilizer since October because

of problems with patient assistance; however, he restarted the medication a week earlier. [AR 591-593] He also reported that he felt sad and missed his children during the holiday season. [*Id.*] On January 13, 2012, Plaintiff reported that he was "doing much better" and was "able to get back on all of his medications." [AR 589-590] Ms. Richards also noted that Plaintiff's PTSD signs and symptoms "seem to be pretty well managed right now," but they may escalate when working on his history of sexual abuse. [*Id.*] On February 3, 2012, Ms. Richards noted that Plaintiff "appears to be stable psychiatrically, as far as his mood disorder goes. I am not really seeing any evidence of his personality disorder flaring up right now" and noted the biggest issue was the PTSD. [AR 587-588]

Then, on February 24, 2012, Ms. Richards drafted a Mental Health Termination Summary in which she noted that during 2010, she saw Plaintiff approximately once per month, then in 2011, she saw him more sporadically, about once every other month. [AR 585-586] She determined that Plaintiff violated the November 28, 2011 contract when he showed up 20 minutes late with no acceptable excuse. [*Id.*]

The records indicate that Plaintiff saw the psychiatrist, Dr. Sciamarella, sporadically from January 2011 through September 2011, then not again until May 2012. [AR 624-627] Plaintiff reported to her at that time that he had been "doing well," "taking meds," and "sleeping well," and he was "getting married next year." [*Id.*] She diagnosed him with an "unspecified episodic mood disorder (primary), biopolar disorder, unspecified, unspecified personality disorder, and post-traumatic stress disorder," and noted "bipolar and personality disorder may be 'rule out' dx." [*Id.*] The doctor advised Plaintiff to follow up with her in three months; however, there are no subsequent records from this doctor.

19

On July 23, 2012, the ODAR issued a Notice of Hearing to the Plaintiff setting a second hearing for October 3, 2012 [AR 181-204], then sent a reminder notice on September 19, 2012 [AR 205-210].  At the hearing, a vocational expert, Dennis Duffin, a medical expert, Dr. Frank Barnes, and a psychological expert, Dr. Robert Pelc, testified.[2] [AR 63-92] Dr. Barnes testified that Plaintiff had "osteoarthritis in his knee due to an osteochondral defect" and "a history of cervical and lumbar pain which is probably due to some degenerative disc disease," neither of which meet or equal the listings for social security disability. [AR 66] Dr. Barnes believes Plaintiff could stand and walk 2-3 hours in an 8-hour day; get up and stand or walk from a sitting position for a few minutes every hour; lift 20 pounds occasionally and 10 pounds frequently; had full use of his upper extremities, including reaching, handling, feeling and fingering; and could be occasionally exposed to cold, humidity and vibration.  Dr. Barnes disagreed with Dr. Krause's opinion that Plaintiff had limitations in stooping, squatting, crawling and kneeling, as well as in handling, reaching and fingering, and that Plaintiff could sit for only 4 hours per day; the doctor did, though, opine that Plaintiff might need a cane for the arthritis in his right knee for any extended periods of time or for ambulation over rough or uneven terrain.

Dr. Pelc, a licensed psychologist, testified that Plaintiff's mental impairments neither met nor medically equaled the listings for social security disability.  He further opined that Plaintiff would have mild limitations in daily activities, moderate limitations in social functioning, concentration, persistence and pace, with respect to simple information processing, and marked limitations with respect to more complex or detailed processing.  He stated that Plaintiff could

---

[2]Plaintiff chose not to testify at this supplemental hearing. [AR81]

understand, remember and carry out simple instructions, and respond appropriately to supervision, co-workers and changes in a routing work setting.   Dr. Pelc did not agree with Dr. Vega and Ms. Richards that Plaintiff had marked limitations in several areas, and in particular in social functioning considering Plaintiff's interactions with friends and in romantic relationships.  The doctor conceded that a person with moderate limitations would have trouble meeting the expectations associated with ability.

Mr. Duffin, a vocational rehabilitation counselor, testified that a hypothetical employee with the same age, background and experience as the Plaintiff, together with the following characteristics – can function at the light exertional level; standing and/or walking for as much as two to three hours out of an eight hour day; sitting would be for as much as eight out of an eight-hour day; there would need to be the ability to alternate those postures as needed; however, he would have the capacity to stand and/or walk, or sit for as much as thirty minutes to sixty minutes, if necessary; there would be occasional use of stairs and ramps, and for stooping, kneeling, bending, and crouching; there would be no climbing of ladders, ropes, and scaffolds, no balancing, and no kneeling or crawling; this person would need the assistance of a hand-held single point cane for extended periods of ambulation, or ambulation over rough or uneven surfaces; the extended period would be where there was some need to stand and/or walk for more than an hour; this person should avoid concentrated exposure to extreme cold, vibration, humidity, and hazards such as unprotected heights, and unprotected major manufacturing machinery; the work would be limited to the unskilled level subject to moderate limitations in the areas of attention and concentration, working in coordination or proximity to others, interacting appropriately with the general public, co-workers, and

supervisors, and moderate limitations in the ability to respond appropriately to changes in the work setting; and moderate being defined in this case to be comparable to a less than occasional basis, such as one-third of the time – could not perform Plaintiff's past work.  However, Mr. Duffin found that such person could work as a "survey worker," "small products assembler," and a "lens block gauger."  Mr. Duffin conceded that employers of these jobs would tolerate 1-1/2 tardies and absences per month.

Thereafter, the ALJ issued an unfavorable decision on October 25, 2012. [AR 11-32]

### III. LAW

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements. *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful

activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is

a determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show

that his impairment(s) would have more than a minimal effect on his ability to do basic work

activities, he is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c).  Step Three determines

whether the impairment is equivalent to one of a number of listed impairments deemed to be so

severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is not listed, he is not presumed to be conclusively disabled.  Step Four then

requires the claimant to show that his impairment(s) and assessed residual functional capacity

("RFC") prevent her from performing work that he has performed in the past.  If the claimant is able

to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f),

416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the

four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the

burden to demonstrate that the claimant has the RFC to perform other work in the national economy

in view of his age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since December

11, 2008, the alleged onset date (Step One).  [AR 16]  The ALJ further determined that Plaintiff had

the following severe impairments: (1) mild degenerative disc disease of the cervical and lumbar

spine; (2) a lumbar strain; (3) status-post cartilage repair surgery for the right knee; and (4) affective,

anxiety and personality disorders (20 CFR 404.1520(c) and 416.920(c)) (Step Two).  [*Id.*]  However,

the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Step Three).  [AR 17-20]

The ALJ then determined that Plaintiff had the RFC to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can stand and walk for two to three hours, and sit for eight hours, during an eight-hour workday; he should have the option to change position between sitting, standing and/or walking, as needed, though he maintains the capacity to sit, stand or walk for 30 to 60 minutes at one time, if necessary; he would require the use of a cane when standing and walking for more than one hour or when ambulating across rough or uneven terrain; he should never climb ladders, ropes or scaffolds, balance, kneel or crawl and should occasionally climb stairs and ramps, stoop, bend or crouch; he should avoid concentrated exposure to extreme cold, humidity, vibration and hazards; the work should be performed at the unskilled level and he would be subject to moderate limitations in the ability to maintain attention and concentration; moderate limitations in the ability to work in coordination or proximity to others; moderate limitations in the ability to interact appropriately with the general public, coworkers and supervisors; and moderate limitations in the ability to respond appropriately to changes in the work setting."  [AR 20]  The ALJ found nothing in the record supporting Plaintiff's statements regarding the intensity, persistence and limiting effects of his physical symptoms; the objective medical evidence and exam findings are inconsistent with Plaintiff's statements regarding his physical health; and Plaintiff's allegations of disabling mental symptoms are inconsistent with the record.  [AR 20-25]

After ruling that Plaintiff had no past relevant work (Step Four), the ALJ went on to

determine that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform work existing in significant numbers in the national economy (Step Five).  [AR 31]  As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA.  [AR 32]

Plaintiff sought review of the ALJ's second decision by the Appeals Council; however, the Council determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1]

## V. STANDARD OF REVIEW

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991) (citing *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or

fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

On appeal, Plaintiff raises four issues: (1) the ALJ did not properly assess the opinion of the treating physician, Dr. Krause; (2) the ALJ had no reason for rejecting Dr. Olswanger's sitting restriction; (3) the ALJ did not properly assess Dr. Davidson's opinion of total disability; (4) the ALJ did not properly assess the severity of Plaintiff's mental impairments; and (5) the Plaintiff requests an immediate award of disability benefits rather than a remand for a new hearing.  [Opening Brief, Statement of Issues, iv]

## VII. ANALYSIS

The Court will analyze each of Plaintiff's issues in turn.

### A.    Assessing Dr. Krause's Opinion

Plaintiff contends that, although the ALJ performed the first step of the two-step process when assessing Dr. Krause's opinion, he did not offer any reason, at the second step, for reducing the weight given to Dr. Krause's opinion; did not offer a reason for failing to account for Dr. Krause's opined limitations; did not discuss the difference between the RFC finding and Dr. Krause's opinion; and erred in picking and choosing through Dr. Krause's opinion, discounting the bulk without explanation.

If Dr. Krause is determined to be one of Plaintiff's treating physicians, his opinion generally should receive "more weight" than other sources.  20 C.F.R. § 404.1527(d)(2).  For this issue, the Court respectfully adopts the excellently stated legal standards set forth by the Honorable Lewis T.

Babcock in *Quintana v. Colvin*, No. 12-cv-03263-LTB, 2014 WL 1309696, at *5-*6 (D. Colo. Apr. 1, 2014) as follows:

> According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).
>
> When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. To do so, the ALJ:

> > must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [...] [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (applying SSR 96-2p, 1996 WL 374188, at *2) (internal quotation marks and citations omitted); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step because, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." *Watkins*, 350 F.3d at 1300. At the second step, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330. If this is not done, remand is mandatory. *Id.* As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4) (emphasis added). Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight to give the opinion. *Krauser*, 638 F.3d at 1330-31 (citing *Langley*, 373 F.3d at 1120) (holding that while absence of objective testing provided basis for denying controlling weight to treating physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this basis")). In weighing the opinion, the ALJ must consider the following factors:

(1) the length of the treatment relationship and the frequency of examination; (2) the

nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331. In applying these factors, "an ALJ must 'give good reasons in the notice of determination or decision' for the weight he ultimatel[y] assign[s] the opinion." *Watkins*, 350 F.3d at 1300 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5; *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Without these findings, remand is required. *Watkins*, 350 F.3d at 1300–01; *accord Krauser*, 638 F.3d at 1330. Lastly, if the ALJ rejects the opinion entirely, he must give "specific, legitimate reasons" for doing so. *Watkins*, 350 F.3d at 1301.

As set forth above, the Plaintiff saw Dr. Krause for neck and back pain three times during the period August 2009-February 2010, at which time the doctor ordered x-rays and an MRI. Dr. Krause noted that the MRI was "basically normal" and the x-ray showed mild arthritis, so determined that no anesthetic injection was indicated, but advised continuing with pain medication and muscle relaxants. [AR 480-482] Dr. Krause also completed what appears to be an informal physical functional assessment at the third appointment in February 2010. [AR 456-458] The doctor diagnosed Plaintiff with "degenerative arthritis lower back" and assessed limitations for lifting and carrying to 20 pounds; sitting for four out of eight hours; standing for two out of eight hours; stooping, squatting, crawling and kneeling should be done rarely; reaching, handling and fingering could be done occasionally; and the doctor stated that these limitations had been at such levels for

one year. [*Id.*]

The ALJ discussed Dr. Krause's findings and opinion as follows:

In August 2009, the claimant complained of neck and back pain. When examined, his neck was supple with full range of motion, though he had pain and spasms of the cervical musculature. Full range of motion was retained throughout the upper extremities, and he had normal grips. Examination of his lower back elicited pain to palpation, but straight leg raises were negative, and strength and sensation were normal throughout the lower extremities. He was prescribed a muscle relaxant and analgesic, to be used "as needed" (Exh. 16F). In September 2009, imaging of the lumbar spine was unremarkable, showing minimal disc bulging at L5-S l (Exh. 14F).

[AR 21-22] and:

After examining the claimant in October 2009, David Krause, MD, advised the claimant to avoid "a lot of heavy lifting" and bending (Exh. 16F). In February 2010, the doctor more specifically concluded the claimant should not lift and carry more than 20 pounds or remain on his feet for more than two hours or sit for more than four hours, during an eight-hour workday. He added restrictions for 30 minutes of sitting at one time and 15 minutes of standing or walking at one time. Dr. Krause further advised rare stooping, crawling or kneeling, and occasional reaching, handling or fingering. He explained he treated the claimant for degenerative arthritis of the lower back (Exh. 13F). Controlling weight is not given Dr. Krause's restrictions, as his conclusion that the claimant cannot sit, stand and walk throughout a normal workday, can rarely stoop and can occasionally reach, handle and finger are inconsistent with the objective evidence of mild cervical and lumbar pathology, full range of motion in the upper extremities, excellent strength (to include the grips) and absence of neurological deficits (Exhs. I F; 6F; 14F; 16F). Partial weight is accorded Dr. Krause's conclusions, but only to the extent he advises a light lifting and carrying limitation, reduced standing, walking and postural activities, and the option to change positions every 30 or more minutes, all of which are well-supported by the knee surgeries and the clinical findings of cervical muscle spasms and reduced lumbar motion (Exhs. 5F; 6F; 16F; 22F).

[AR 26] Plaintiff contends that, although the ALJ properly made a finding that Dr. Krause's opinion would not be accorded controlling weight, the ALJ erred in failing to give a reason for reducing the

weight he gave the opinion.  The Court disagrees.  The ALJ need not give "specific" reasons unless he rejects the medical opinion outright; rather, he need only give "good" reasons for reducing the weight of a medical opinion.  *See Watkins*, 350 F.3d at 1300-01.  Here, one can infer from his decision that the ALJ found the objective evidence of a "normal" MRI, an x-ray reflecting "mild" arthritis, and examinations revealing "full range of motion," negative tests, and normal grip strength did not support Dr. Krause's substantial limitations on Plaintiff's posture and upper and lower extremity abilities.

Plaintiff also argues that the ALJ did not discuss the differences between his RFC and Dr. Krause's opinion and erred in picking and choosing through the opinion for support of his decision. As to "differences," Plaintiff cites *Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir. 1996) for the proposition that "[t]he ALJ must explain **any difference** between the ALJ's RFC finding and the physician's RFC opinion."  Opening Brief, docket #14 at 31 (emphasis in original).  However, in *Winfrey* (at the page cited by Plaintiff), the Tenth Circuit discussed an ALJ's duties in evaluating a claimant's mental impairments by using the specific procedure set forth in 20 C.F.R. § 404.1520a, including the completion of a PRT form.  *Id.*  After finding that the ALJ failed to relate his conclusions on the PRT to evidence in the case, the Tenth Circuit noted "the ALJ's conclusions as to plaintiff's abilities differed dramatically from Dr. Spray's conclusions; a difference which the ALJ did not explain."  *Id.*  The Court does not accept Plaintiff's proposition based upon such "note" in *Winfrey* and, rather, infers from the "note" that the Tenth Circuit would require an ALJ to relate his/her conclusions to the evidence in the case, and to explain any "dramatic" differences between the ALJ's conclusions and the doctor's opinion.

Here, the ALJ related his conclusions to the evidence in the case, specifically in finding that Dr. Krause's February 2010 assessment was not supported by the objective medical evidence (clinical findings, observations, treatment and medication) procured/prescribed by Dr. Krause and in determining that the objective evidence reveals the Plaintiff suffers some limitations, which are considered in the RFC. [*See, e.g.*, AR 21-23]

As for any differences between the ALJ's conclusions and Dr. Krause's opinion, both the ALJ and Dr. Krause determined that Plaintiff could sit for 30 minutes at one time, but Dr. Krause found that Plaintiff could only be on his feet (stand/walk) for 15 minutes at one time, while the ALJ determined the time could be 30-60 minutes at one time; however, the ALJ also determined that the Plaintiff should use a cane for a longer period of time or "when ambulating across rough or uneven terrain," while the doctor mentioned nothing about a cane.  Dr. Krause concluded that Plaintiff should rarely stoop while the ALJ found the Plaintiff could occasionally do so, but Dr. Krause found that Plaintiff could rarely crawl or kneel while the ALJ concluded he should never do so.  Thus, although there are certainly differences between Dr. Krause's opinion and the ALJ's conclusions, the difference certainly are not dramatic, and the ALJ's conclusions are consistent with the objective medical evidence.

Moreover, the Court disagrees that the ALJ "reject[ed] the bulk of Dr. Krause's restrictions." Opening Brief at 32.  While the ALJ may have articulated only "partial" weight given to Dr. Krause's opinion, the opined limitations are quite similar, as set forth above.  As for those limitations the ALJ chose not to adopt (i.e., manipulative), he explained that the objective evidence

did not support such limitations.[3]   Accordingly, the Court finds that the ALJ did not improperly "pick and choose" from Dr. Krause's opinion.

In sum, the Court finds the ALJ properly assessed the opinion of the treating physician, Dr. Krause, in formulating the RFC and making the disability determination.

**B.      Rejection of Dr. Olswanger's Sitting Restriction**

Plaintiff contends that the ALJ erred in declining to adopt Dr. Olswanger's four-hour sitting restriction without explanation.

The SSA referred Plaintiff to Justin Olswanger, D.O. for a consultative physical examination on April 4, 2009.  [AR 374] Dr. Olswanger examined Plaintiff's right knee and reviewed two x-rays which he determined to be "normal." [AR 378] The doctor also considered Plaintiff's complaints of neck and back pain; Plaintiff reported that, "a while back," he fell about 15 feet at work, landed on his back, and was paralyzed from the waist down for about 30 seconds. [AR 374] He asserted the x-rays from that time showed a "bulge" in his back and another in his neck at C6-C7, but he was afraid to do cortisone injections for the pain. [*Id.*] Upon examination, Dr. Olswanger noted some "tenderness to palpation on the paraspinal musculature of his cervical and mid-thoracic and lumbar spine," but noted that the x-ray of the lumbosacral spine was normal. [AR 378-379] Dr. Olswanger concluded that Plaintiff could sit, stand and walk about four hours in an eight-hour workday, could

---

[3]The Court notes that, during the three times he visited Dr. Krause, Plaintiff never mentioned any problems with manipulation or in his upper extremities.  Dr. Krause's examination in August 2009 revealed "full range of motion" in his upper extremities, "negative Phalen and Tinel signs bilaterally" and "normal grip strength bilaterally." [AR 482] Dr. Krause never mentioned anything in the record about manipulation issues.  Accordingly, the Court finds the ALJ was correct in finding no objective evidence to support Dr. Krause's manipulation restrictions.

lift and carry ten pounds frequently and occasionally, and should be limited in "anything involving range of motion of [the] spine." [AR 379]

> Regarding Dr. Olswanger's opinion, the ALJ found:
>
> After conducting the physical consultative examination in April 2009, Justin Olswanger, DO, concluded the claimant remained capable of standing, walking or sitting for four hours during a normal eight-hour workday. He felt the claimant should lift or carry about 10 pounds and advised postural limitations for maneuvers involving range of motion of the spine (Exh. 6F). Limited weight is given the conclusions of Dr. Olswanger, insofar as he advises that the claimant remain on his feet for only part of the workday and have some degree of postural limitations. These recommendations are well-supported by the repeated knee surgeries and the findings of reduced lumbar motion (Exhs. 5F; 6F; 11 F; 22F). But his suggestion that the claimant avoid lifting more than 10 pounds is inconsistent with the findings of excellent strength in both upper and lower extremities, as well as the objective evidence of minimal cervical and lumbar pathology (Exhs. 1F; 6F; 14F; 16F).

[AR 25]

The Plaintiff notes that "Dr. Olswanger's four hour sitting restriction is identical to the sitting restriction issued by the treating physician, Dr. Krause" and cites the same cases for the propositions that an ALJ must explain the differences between the doctor's opinion and his conclusion, as well as that an ALJ may not pick and choose from an opinion to support a finding of non-disability. Opening Brief at 25-26.

First, the Court concludes that the Plaintiff's interpretation of the ALJ's RFC is too narrow; the ALJ did not simply find the Plaintiff "able to sit for eight hours per day," but, based on the evidence, determined "he should have the option to change position between sitting, standing and/or walking, as needed, though he maintains the capacity to sit, stand or walk for 30 to 60 minutes at one time, if necessary." [AR 20] Although he does not specifically articulate a "rejection" of Dr.

Olswanger's sitting restriction, the ALJ explains that he gives some weight to the doctor's opinion that Plaintiff "remain on his feet for only part of the workday and have some degree of postural limitations ... [t]hese recommendations are well-supported by the repeated knee surgeries and the findings of reduced lumbar motion." [AR 25] Certainly, one can reasonably infer that the ALJ included sitting as a "postural ... maneuver involving range of motion of the spine" and found that "some degree" of limitation was supported by the evidence.  [*Id.*]  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (the ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight).

In any case, as with Dr. Krause, the Court finds the ALJ was correct in determining an eight-hour per day sitting restriction with the ability to change position, such that the Plaintiff sits no more than 30-60 minutes at one time, comports with the evidence in this case.

C.      **Assessing Dr. Davidson's Opinion of Total Disability**

Plaintiff argues that the ALJ improperly rejected outright Dr. Davidson's disability opinion set forth in a state disability form.

On June 21, 2011, Dr. Davidson executed a "Med-9" form for the Plaintiff finding "this individual has been or will be totally and permanently disabled to the extent they are unable to work at any job due to a physical or mental impairment," which were listed on the form as "right knee, back, neck and depression." [AR 569]

Regarding this finding, the ALJ noted:

In June 2011, Scott Davidson, MD, said the claimant was permanently and totally disabled because of back, neck and knee problems and depression (Exh. 25F). But in treatment records from that date, the only clinical finding was mild crepitus in the

right knee (Exh. 28F). But Dr. Davidson does not explain his terms, and he does not provide objective findings or specific limitations. Further, his opinion regarding the claimant's ability to work involves statutory interpretation of the term "disabled." The determination of whether the claimant is disabled is reserved for the Commissioner, and treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled (SSR 96-Sp). This opinion is accorded neither controlling weight nor any weight.

[AR 26]

The Court finds the ALJ's weighing of this opinion proper.  It is appropriate for an ALJ to reject a physician's "Med-9" form, which is prepared solely for a Colorado state disability benefits determination. *See Quintero v. Colvin*, No. 12-cv-01849-WJM, 2013 WL 3984619, at *3 (D. Colo. Aug. 2, 2013); *see also Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) ("The ALJ properly gave no weight to this [Med-9] form, which lacked any functional findings.").  In addition, the ALJ noted that Dr. Davidson did "not explain his terms, and he does not provide objective findings or specific limitations" in the opinion.  These reasons are legitimate and specific and, therefore, the ALJ  did not err in failing to assign any weight to this opinion.  *Hanken v. Colvin*, -- F. Supp. 3d --, 2014 WL 4651809, at 5 (D. Colo. Sept. 18, 2014) (citing *Andersen v. Astrue*, 319 F. App'x 712, 723-25 (10th Cir. 2009) and *Karstetter v. Colvin*, 2013 WL 1768689, at *4 (D. Colo. Apr. 23, 2013)).  Notably, the Plaintiff cites no legal support for his position that an ALJ must "recontact" a doctor for clarification of the reasons, or lack thereof, given on a Med-9 form.

**D.     Assessing the Severity of Plaintiff's Mental Impairments**

Plaintiff contends that the ALJ's limitation to unskilled work did not adequately account for

the mental impairments stated by Dr. Pelc.

At the October 3, 2012 (second) hearing, Robert Pelc, a licensed psychologist, testified that Plaintiff's mental impairments neither met nor medically equaled the listings for social security disability.  He further opined that Plaintiff would have mild limitations in daily activities, moderate limitations in social functioning, concentration, persistence and pace, with respect to simple information processing, and marked limitations with respect to more complex or detailed processing. He stated that Plaintiff could understand, remember and carry out simple instructions, and respond appropriately to supervision, co-workers and changes in a routing work setting.   Dr. Pelc did not agree with Dr. Vega and Ms. Richards that Plaintiff had marked limitations in several areas and, in particular, in social functioning considering Plaintiff's interactions with friends and in romantic relationships.  The doctor conceded that a person with moderate limitations would have trouble meeting the expectations associated with ability.

Regarding Dr. Pelc's testimony, the ALJ noted:

Testimony was also taken from Robert Pelc, PhD, who has been a licensed clinical psychologist since 1977, and maintains a private practice in Colorado. Dr. Pelc testified that he also disagreed with Ms. Richard's and Dr. Vega's marked/extreme characterizations of the claimant's functioning as these conclusions were inconsistent with the evidence as a whole. For example, Dr. Pelc reviewed data showing the ability to maintain relationships, to go out with friends and get along with family members to the extent he was able to actually live with them, and to establish new dating relationships – none of which coincides with even marked levels of social limitations. Several of the records (Exhs. 18F, 27F, 29F) showed normal mental status examination, and when comparing that information to Dr. Vega's test results, he made the divergent decision that the claimant would have marked limitations with more complex work and moderate limitations with regard to simple work. After considering the evidence in its entirety, Dr. Pelc concluded the claimant was capable of performing the basic mental functional capacities of understanding, remembering and carrying out simple instructions, making judgments commensurate with the

performance of simple work, responding appropriately to supervisors, coworkers and usual work situations, and dealing with changes in work settings. Dr. Pelc concluded that, by and large, the claimant retained adequate functioning to perform simple and repetitive work, but might, from time to time, require some supervision, though he did not feel this would be extraordinary or more than customary.  If the claimant were challenged with complicated tasks, he would have greater difficulties. He did not feel that the claimant would be significantly compromised with regard to completing a normal workday or workweek. He could tolerate contact, but should not have more than frequent contact with others. He said that claimant's interactions should range from occasional to frequent in length.

Dr. Pelc defined a moderate degree of limitation as one that would cause more than slight limitations, but the capacity to perform that function satisfactorily, occurring on an occasional basis or less. He stated the claimant would be moderately limited in a number of areas, and markedly limited with regard to detailed information processing. But Dr. Pelc must base his testimony on the premise that the claimant's subjective statements regarding his mental functioning are fully credible, while the undersigned is tasked with weighing the claimant's credibility, and finds it lacking. To the extent that Dr. Pelc concurs with moderate limitations in the ability to maintain attention and concentration with regard to simple work, in the ability to work in coordination or proximity to others, in the ability to interact appropriately with the general public, coworkers and supervisors, and in the ability to respond appropriately to changes in the work setting, his opinions are accorded great weight. The undersigned also accepts the doctor's testimony that the claimant would be more significantly restricted when performing more complicated tasks, and has restricted the claimant to unskilled work. The remainder of Dr. Pelc's assessment is not accepted as consistent with the evidence as a whole, highlighting interpersonal issues and increased anxiety, especially when noncompliant with medications, but also depicting the claimant as mentally stable (Exhs. 12F; 18F; 27F; 29F). The undersigned has specifically considered mental functional limitations that might affect the claimant's ability to maintain a schedule and regular attendance, and notes that the evidence does show the claimant missed a number of mental health appointments during 2011 and was late for an appointment in 2012, but the evidence fails to establish any nexus between this behavior and his psychological status, as opposed to volitional conduct on his part. (Exh. 27F).

[AR 28-29] Based on the evidence and this testimony, the ALJ assessed the following severe mental impairments – affective, anxiety and personality disorders – and determined Plainitff's mental RFC as "the work should be performed at the unskilled level and he would be subject to moderate

limitations in the ability to maintain attention and concentration; moderate limitations in the ability to work in coordination or proximity to others; moderate limitations in the ability to interact appropriately with the general public, coworkers and supervisors; and moderate limitations in the ability to respond appropriately to changes in the work setting."  [AR 20]

Plaintiff's primary contention is that the ALJ improperly ignored Dr. Pelc's reference to moderate limitations in "simple and repetitive" tasks, but accepted only the reference to "simple" tasks.  Plaintiff argues that the ALJ's limitation of "unskilled work" in the RFC does not equate to "simple and repetitive" work, particularly since the definition of "unskilled work" does not include "repetition" and because the vocational expert was not told of any limitation to repetitive work.

First, the Court disagrees that the ALJ "ignored" Dr. Pelc's references to moderate limitations in "simple and repetitive" work.  In addition to acknowledging that Dr. Pelc found "the claimant would have marked limitations with more complex work and moderate limitations with regard to simple work," the ALJ also noted that Dr. Pelc "concluded that, by and large, the claimant retained adequate functioning to perform *simple and repetitive work*, but might, from time to time, require some supervision, though he did not feel this would be extraordinary or more than customary." [AR 29 (emphasis added)]

Second, while Dr. Pelc certainly testified that he would impose moderate limitations on "simple and repetitive" work, he did not place any emphasis on either "simple" or "repetitive" but in discussing with Plaintiff's counsel the Plaintiff's ability to sustain an ordinary work routine without special supervision, Dr. Pelc testified as follows:

What I'm saying is by and large he has the satisfactory capacity, as I answered the Court's

question, to maintain adequate functioning regarding simple information.  I think the Courts called it unskilled work, and so I'm not seeing him as someone who would have to have, like in a sheltered workshop, someone sitting there reminding him how many fish hooks he needed to count to put in a box on a repetitive basis. Would he occasionally – I just stated the art question, I know, but would he from time to time require some supervision? Well, yeah, but I think everybody does in some type of work setting.  Would it be extraordinary?  No.  I don't think so.

[AR 79]

Third, and most importantly, the Court finds the ALJ sufficiently accounted for any limitations to simple and repetitive work in the RFC by concluding the Plaintiff "would be subject to moderate limitations in the ability to maintain attention and concentration."  This finding comports with Dr. Pelc's testimony at AR 75-76[4] and was given to the vocational expert to consider

---

[4]During the ALJ's examination of Dr. Pelc, he asked:

Q Now the prior RFC that was given at the previous hearing suggested that there would be moderate limitations in the ability to maintain attention and concentration, moderate limitations in the ability to work in coordination or proximity to others, a moderate limitation in the ability to interact appropriately with the general public, co-workers, and supervisors, and moderate limitations in the ability to respond appropriately to changes in the work setting. Would those all be consistent with your review of the records?
A  I believe so.  Again, I'm putting a higher level of restriction in terms of information processing, which is more detailed or complex, and to the extent the rest of that information is certainly consistent.  That first comment that you made about information processing being at a moderate level of restriction, again, I'm actually splitting this into simple versus more than simple assignments.  So if the work is something other than simple and repetitive, or the tasks are more than simple and repetitive I think there would be a problem.
Q  And when you used the term moderate in your description of the level of severity, how do you
understand that term to be defined?
A  More than slight limitations, but still able to function satisfactorily.
Q And in terms of its frequency of occurrence, or level of occurrence, would it be consistent with your thinking to describe it as occurring as much as on an occasional basis or less?
A  Yes.
Q Would there be other areas of concern to you that would be at the moderate level or not beyond

in determining whether Plaintiff could perform any work [AR 85]. Consequently, the Court concludes that the ALJ properly assessed the severity of Plaintiff's mental impairments.

**E.      Immediate Award of Benefits**

The Court has concluded that the ALJ's decision should be affirmed; thus, a discussion concerning an "immediate award of benefits" is not proper.

**CONCLUSION**

In sum, the Court concludes that the ALJ in this case properly assessed the opinion of the treating physician, Dr. Krause; properly rejected the four-hour sitting restriction; properly rejected Dr. Davidson's opinion set forth in the Med-9 form; and properly assessed the severity of Plaintiff's mental impairments. The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied. Therefore, the decision of the ALJ that Plaintiff Gilbert Lopez was not disabled is AFFIRMED.

Dated at Denver, Colorado this 14th day of January, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

--------

what I suggested to you?
A  Not really.  No.